BARNET, J.,
delivered the opinion of the court:
This suit is brought to recover the sum of $51,000 alleged to have been deposited for safe-keeping pursuant to Navy Eegulations with the officer in command of a United States naval vessel. The facts set out in the petition are in substance as follows:
The claimant is the grandson and the only living descendant of one Carlos de Castillos. In January, 1869, which was about the beginning of the revolutionary outbreak in Cuba, Castillos, being under suspicion by the Spanish authorities, intrusted to the United States consul at Habana, Cuba, 3,000 ounces of Spanish gold of the value of $51,000 for safe-keeping until called for. This deposit was evidenced by a receipt of the consulate whereby it appeared *165 that said gold was placed on board the United States flagship Contoocook. It is further averred that neither said Castillos nor any of his heirs or legal representatives has ever made any demand for said gold before the bringing of this suit, and, though the petition is somewhat obscure upon that point, we assume that it is claimed that no part of said gold or its value has ever been paid either to said Castillos or any one authorized to receive the same. It should be added that the record produced on the trial of this case shows that gold of the value alleged was received by Capt. Balch, then commanding the flagship Contoocook, about the time alleged, from some party while said flagship was in the harbor of Habana.
For the exoneration of Captain (now Admiral) Balch from all wrong in this matter it should be stated that upon the trial of this case it was shown conclusively that very soon after he received it he turned over the gold in question to a party who he at least had good reason to believe was entitled to receive it; but as we think this case turns upon the question of jurisdiction the merits of the case are not considered.
Capt. Balch received the gold pursuant to certain Navy Regulations then in force, which are as follows:
Article 8 of the Articles for the Government of the Navy provides for certain offenses for which persons in the Navy may be punished, and among others it provides punishment for any such person who “ takes, receives, or permits to be received on board the vessel to which he is attached any goods or merchandise for freight, sale, or traffic, except gold, silver, or jewels, without authority from the President- or Secretary of the Navy.”
The Navy Regulations then in force, under said articles provided as follows:
“ 1020. When gold, silver, or jewels shall be placed on board any vessel of the Navy for freight or safe-keeping, the commander of the vessel shall sign bills of lading for the amount, and be responsible for the treasure. The usual percentage shall be demanded from the shippers of the treasure, and its amount shall be divided as follows: One-fourth to the commander in chief of the squadron to which the vessel may *166 belong; one-balf to the commander of the vessel; one-fourth to the Navy pension fund. When a commander in chief of a squadron does not participate in a division of the amount, then two-thirds of the whole of it shall inure to the commander of the vessel and the remainder to the pension fund.”
If the plaintiff is to recover in this suit it can only be on the theory that the Government was a bailee of this gold, and either that it has never returned it and still has it in its possession, at least constructively, or that it has lost it through the negligence of its officers.
In Kelsey v. United States (1 C. Cls. R., 314) the plaintiff had deposited with a United States quartermaster money as a pledge for the good faith of his bid. He complies with the conditions of the proposals, but before the contract is executed it is agreed that the proposals and all subsequent proceedings shall be canceled. The money deposited is not returned and is paid into the Treasury by the quartermaster. It was held that an action would lie against the Government to recover it back.
In Sausser v. United States (9 C. Cls. R., 338), a distiller, pursuant to Treasury regulations, made application for a meter and deposited the prescribed amount with a deputy collector who receipts for it. The deputy collector does not pay over the money to the manufacturer of the meter, but embezzles it. Held that an action would lie against the Government to recover such deposit back. In delivering the opinion of the court, Nott, J., said:
“The Government chose to assume the responsibility of receiving these deposits, instead of allowing distillers to deal directly with the manufacturers of the meters. The collector was the agent of the Government, which had a discretion in selecting him, and was not the agent of the distiller, who was compelled against his wishes to deal with him. The loss, therefore, must fall upon the principal of this agent, which is the Government.”
In Boughton v. United States (12 C. Cls. R., 330), it was held that where a party deposits money with a collector of internal revenue, with authority to apply it to a proposed compromise of certain revenue demands then pending against the depositor, but the collector, after the proposed compro *167 mise has been rejected by the Government, applies the money to an assessment against the depositor, and pays the money into the Treasury, this court has jurisdiction of an action to recover the money back.
In Pharis v. United States (16 C. Cls. R., 501), a quartermaster, in May, 1865, had in his custody a piano which he sold to the claimant, pursuant to an order of the commanding officer of the Military District of Southwest Missouri, directing all commissaries and quartermasters throughout the district “ to sell such property not suitable for use or issue as may have been, or may hereafter be, turned over to them by the officers of the provost-marshal’s department.” Subsequently the owner of the piano brought an action of replevin against the claimant and recovered it from him. The claimant brought suit against the Government to recover back the purchase money of the piano and the costs to which he had been subjected. Jurisdiction was denied on the ground that the evidence did not show that the proceeds of the piano ever reached the Treasury. In delivering the opinion of the court, Nott, J., said:
“ If an action like this can be maintained against the Government (upon which point we express no opinion) it is manifest, we think, that it must stand upon the basis of the Government having in its possession money of the claimant which, in equity and good conscience, it should not withhold from him, and for which, upon a well settled principle of law, he should have an action to recover it back as money had and received to his use.”
In the recent case of Kyle v. United States (46 C. Cls. R., 197) a suit was brought by a private in the Marine Corps, who was acting as post barber, to recover back money which he had paid as a tax into the “ post fund,” which is a fund derived from economical administration of post domestic affairs, voluntary contributions, etc., and expended for the betterment of post conditions among the marines; and is collected and managed pursuant to the Navy Begulations. This court denied jurisdiction, and the court in its opinion said: “ The defendants are neither parties to nor privy with the transactions in the sense of legal responsibility to respond in damages for its collection or disbursement.”
*168 Other cases might be cited bearing upon the question, from all of which we deduce the general principle as to the jurisdiction of this court to entertain cases for the recovery of money back which has been paid to officers of the' Government, to be either that the money so sought to be recovered has actually reached the Treasury or has been paid to some officer of the Government authorized by some law or regulation to receive it for the use of the United States.
We think the averments in the petition in this case fall far short of either of these requirements. By the Navy Kegulations quoted the Government did not become a common carrier (even if it were possible for it to do so); on the contrary, it especially negatives that relation, for it says that where “ gold, &c., is placed on board * * * the captain shall * * * be responsible for the same.” The reason for this regulation is not far to seek. The commanders of our war vessels were doubtless often importuned to carry valuables from one port to another, and this regulation simply permitted it, and to prevent extortion prescribed the charges to be made and the disposition of such charges, with a provision that a portion of the same should be placed in the Navy pension fund, thus making the whole transaction very similar to the accumulation of the “ post fund ” involved in the Kyle case, sufra.
We see no difference in the liability assumed by the Government in the case under consideration and that assumed by at one time allowing rural carriers to carry express matter to piece out their salaries. By an act of Congress of April 22, 1902 (32 Stat., vol. 1, pp. 107, 113), Congress provided that rural carriers “ shall not be prohibited from doing an express-package business, provided it does not interfere with the discharge of their official duties.”
Thus rural carriers were permitted to do exactly the same kind of business the Navy Eegulations under consideration permitted naval officers to do. In the case of naval officers the Government expressly denied any liability on its part; in the case of rural carriers nothing was said on this subject.
We hardly think anyone would contend that, if a rural carrier through negligence had lost a package of gold intrusted to him or had embezzled it, the Government would be liable *169 for his miscarriage; and if not why should it be liable for the miscarriage of a naval officer under this Navy regulation?
We do not think a claim against the United States such as alleged in the petition in this case can be maintained, and the petition is dismissed.